IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Shara Jenkins, | : | Case No. 1:04CV180 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Defendants' |
| Board of Education, | : | Motion for Summary Judgment |
| Rock Hill Local School District, et al., | : | and Denying Plaintiff's Motion to |
| | : | Strike |
| Defendants. | : | |

This matter is before the Court on Defendants' motion for summary judgment (doc. 19),

Plaintiff's memorandum in opposition thereto (doc. 20), Defendants' reply in support of its

motion (doc. 21), Plaintiff's motion to strike Defendants' reply (doc. 22), and Defendants'

memorandum in opposition to Plaintiff's motion to s vtrike (doc. 23).  For the reasons that

follow, the Court grants Defendants' motion for summary judgment and denies Plaintiff's

motion to strike.

I.      BACKGROUND

Plaintiff Shara Jenkins filed this lawsuit, individually and in her capacity as mother and

legal guardian of Shanell Ratcliff, against the Rock Hill Local School District Board of

Education (the "Board") and the school's superintendent, Lloyd Evans, in his official and

individual capacities.  Jenkins made the following claims in her complaint: (1) violation of her

and her daughter's First Amendment rights to free expression and privacy, (2) slander, (3)

intentional infliction of emotional distress, and (4) invasion of privacy.  (Doc. 1.)  After

1

Defendants moved for summary judgment on each of Jenkins' claims, Jenkins dismissed the three state law claims.  (Doc. 20 at 12.)  Accordingly, only Jenkins' First Amendment claims, brought pursuant to 42 U.S.C. § 1983, remain for the Court's consideration.

Neither Jenkins' Complaint nor her memorandum in opposition to Defendants' motion for summary judgment precisely articulate the origin of the dispute between Jenkins and the school.  Nonetheless, the Court has gleaned the following facts from the record.  In March 2000, Jenkins' daughter Shanell Ratcliff was diagnosed with Type I diabetes.  Jenkins enrolled Shanell as a first-grade student at the Rock Hill Elementary School for the 2000-2001 school year. Jenkins filled out three "Administration of Medication" forms for the 2000-2001 school year that gave Rock Hill employees permission to assist Shanell with her diabetes management.  (Jenkins dep. Ex. I.)  Specifically, the forms instructed Rock Hill to monitor Shanell's blood glucose levels and to take the following actions: if Shanell's glucose was less than 70, the school was to call Jenkins and give Shanell orange juice; if it was greater than 200, the school was to call Jenkins and give Shanell water; and if Shanell lost consciousness, the school was to administer Shanell a glucogen shot and call both Jenkins and Shanell's physician.  (*Id.*)  These Administration of Medication forms were signed by both Jenkins and Shanell's doctor.  (*Id.*)  It appears that Jenkins had no complaints with the way Rock Hill responded to Shanell's diabetes during the 2000-2001 school year.  (Jenkins dep. vol. II, 110.)

Jenkins enrolled Shanell at Rock Hill as a second-grade student in for the 2001-2002 school year.  Again, Jenkins filled out three "Administration of Medication" forms that gave Rock Hill employees permission to assist Shanell with her diabetes management.  (Jenkins dep. Ex. C.)  The 2001-2002 forms authorized somewhat different measures than the previous year,

allowing Rock Hill to take the following actions: if Shanell's glucose was above 250, the school was to call Jenkins to administer insulin[1] to Shanell; and if Shanell lost consciousness, the school was to administer Shanell a glucogen shot. (*Id*.) These forms were signed by Jenkins and Shanell's physician. (*Id*.)

Jenkins alleges that sometime in October 2001, the Defendants became "uncooperative" with her, and she became dissatisfied with Rock Hill's response to Shanell's diabetes. (Doc. 1 ¶ 14; Jenkins dep. vol. II, 115-120.) Apparently, the grandmother of a diabetic child enrolled in a different school district told Jenkins that Jenkins did not have to go to the school to administer Shanell's insulin shots. (Jenkins dep. vol. II, 28.) Jenkins then told the school nurse, Marsha Wagner, that she wanted the nurse to give Shanell insulin shots if her blood sugar tested higher than the acceptable limit of 250. (*Id.* at 104, 124-25.)

Nurse Wagner told Jenkins that she needed written authorization from Shanell's doctor in order to have a school official administer insulin to Shanell. (Jenkins aff. ¶ 21; Jenkins dep. vol. II, 133-34.) However, Jenkins never gave the school an Administration of Medication form permitting Wagner to give Shanell such an injection. ( Jenkins dep. vol. II, 88-89, 123-24.) Jenkins testified that she did not fill out an authorization form to instruct anyone at the school to inject Shanell with insulin because she "couldn't write something down that they refused to do." (*Id*. at 95.) Jenkins claims that Nurse Wagner said she was unable to administer Shanell's insulin shots because "she'd be liable" if she did. (*Id*. at 124-25.) It appears from the record that at some point in the Fall of 2001, Nurse Wagner asked Shanell what she ate every day at home. (*Id*. at 43-44.) When Jenkins learned of this, she told Nurse Wagner not to ask Shanell what she

---

[1] The brand of insulin prescribed to Shanell was Humalog® and is referred to as such in the record.

ate anymore because Jenkins "didn't feel that it was any of her [Nurse Wagner's] business" and that it was an invasion of Shanell's privacy. (*Id*. at 44-45.) Defendants assert that Nurse Wagner provided medical care to Shanell consistent with the course of treatment prescribed by Shanell's doctor.

Jenkins alleges that she spoke with school superintendent Lloyd Evans on October 29, 2001 about her concerns over the school's participation in giving Shanell medication. (Jenkins aff. ¶ 18.) Jenkins then contacted the Board of Education and the Ohio Coalition to complain about the school's response to Shanell's diabetes. (*Id*. at ¶¶ 29, 30.) Jenkins alleges that Superintendent Evans then called her on November 27, 2001 and told her not to bring Shanell back to Rock Hill. (*Id.* at ¶ 31.) Shanell missed approximately seven days of school as a result of a dispute over whether Shanell was still enrolled in the school. (Jenkins dep. vol III, 76-77, 80.) Jenkins contacted the Office of Civil Rights. (Jenkins aff. ¶ 32.)

Shanell returned to school on December 6, 2001. (Jenkins aff. ¶ 38.) The following day, Jenkins claims that she was barred from Shanell's classroom and was told to sign in at the front office. (Jenkins aff. ¶ 44.)[2] Defendants respond that Jenkins was stopped at the front office because she was required to comply with the general policy of signing in before seeing her daughter during school hours. (Doc. 19 at 6.) Jenkins claims that when she confronted Superintendent Evans about this latest episode in what she perceived to be a string of injustices, he warned that he would be calling Children's Services. (Jenkins aff. ¶ 48.) Jenkins wrote a letter to the editor of the *Ironton Tribune* criticizing Rock Hill administrators for what she

___

[2] Jenkins in her deposition testified that it was December 20, 2001 when she was asked to start checking in upon her arrival at the school. (Jenkins dep. vol III, 111.)

4

regarded as their unwillingness to treat Shanell fairly, and the *Tribune* published the letter on December 13, 2001.  (*Id.* at ¶ 49, Ex. A.)

On December 18, 2001, Nurse Wagner called Shanell's doctor's office to find out what the school was supposed to do if Shanell's blood sugar tested above 250 but the school could not get in touch with Jenkins to administer Shanell's insulin injection.  (Jenkins dep. vol. II, 98-99.) Jenkins testified that Nurse Wagner should never have contacted Shanell's doctor because "they [the school] were the ones supposed to administer Humalog [insulin]."[3]  Jenkins then filed a complaint against Shanell's doctor with the Ohio State Medical Board for talking with Nurse Wagner about Shanell's condition.  (*Id.* at 96-97.)

On December 19, 2001, an anonymous caller filed a complaint against Jenkins with the Lawrence County Department of Job and Family Services (hereafter "Family Services"). (Porter dep. 12.)  The next day, Family Services investigator Richard Blankenship informed Jenkins that she was being investigated for medically neglecting Shanell.  (Jenkins dep. vol. III, 81-82.)  Jenkins claims that Blankenship told her either Superintendent Lloyd Evans or school principal Fred Evans made the complaint.  (Jenkins dep. vol. III, 152-54.)  Lloyd Evans testified that he did not make the complaint to Family Services.  (Evans dep., vol. III, 39.)  On January

---

[3] Jenkins argues that even though she did not provide the school with authorization to administer Shanell's insulin, the school should have done so anyway.

"Q.  The instruction [in the Administration of Medication form] was that they were to call you, wasn't it, in that form?

A.  What else could they do if they wouldn't do it theirself.

Q.  And if they couldn't reach you what did you want them to do?

A.  They should know what to do.  The nurse said she was trained.

Q.  If she needed a shot and your instructions were to call you and they couldn't reach you, what did you want them to do?

A.  Well, they should have give her Humalog but they didn't want to do that."  (Jenkins dep. vol. II, 102.)

22, 2002, Family Services filed a complaint against Jenkins in the Lawrence County Court of Common Pleas.  (Doc. 20 at 6.)  Family Services dismissed the complaint in May 2002.

In early January 2002, Shanell's physician recommended that Shanell begin home schooling.  (Jenkins dep. vol. III, 117, 144.)  Jenkins took the recommendation letter to Superintendent Evans, who told her he would contact a tutor.  (*Id*. at 118.)  Jenkins does not deny that Shanell's doctor suggested home schooling, but she also argues that Shanell's exit from Rock Hill Elementary was related to a confrontation between Shanell's sister and school administrators on January 3, 2002.  (*Id*. at 132.)[4]  Shanell's last day of school at Rock Hill was January 3, 2002.  (*Id*.)

Rock Hill was charged with providing Shanell's home school education through the services of a tutor. (Doc. 20 at 7; doc. 21 at 5.)  Defendant Evans contends that the tutor was having difficulty coordinating with Jenkins and that "the school was not able to locate a replacement tutor."  (Doc. 21 at 6.)  Jenkins claims that the assigned tutor only came to work with Shanell four times and that, as a result, Shanell obtained no schooling for the last three months of the 2001-2002 school year.  (Jenkins dep. vol. III, 174, 180.)  Jenkins enrolled Shanell in a different school, Dawson Bryant, for the following school year.  (*Id*. at 121.)

---

[4]  Apparently Jenkins sent her daughter April to school with Shanell that day so April could give Shanell her insulin injection.  Jenkins claims that a prosecutor and Family Services investigator Blankenship were at the school, and that the prosecutor called her and said that if April didn't leave the school he would arrest her.  Blankenship then asked Jenkins to come to the school to administer Shanell's insulin.  Jenkins refused, telling the school that April could do it.  April did not administer Shanell's insulin shot but went home.  Jenkins and April then went back to the school and picked up Shanell.  (Jenkins dep. vol. III, 133-39.)

Jenkins' claim against the school board is based on her allegation that the board failed to act in support of her and Shanell.[5]  Specifically, she testified that she felt that the board had not done enough to oppose Superintendent Evans.  (*Id*. at 183.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

---

[5]  "Q.  So you're saying because the board members didn't do anything, that harmed you and your daughter?  A.  Yes."  (Jenkins dep. vol. III, 165.)  "Q.  Why did you sue the Board of Education?  A.  Because I felt they could have done more than what they done."  (*Id*. at 225.)

for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is

not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III.   ANALYSIS

### A.   Failure to Exhaust Remedies Under the Individuals with Disabilities Education Act (IDEA)[6]

The Court first addresses Defendants' contention that Jenkins' claim is essentially a

"back door IDEA action" and that her claim fails because she did not exhaust her administrative

remedies under the IDEA. (Doc. 19 at 7.) Defendants argue that, although Jenkins brings her

claim under the First Amendment, it is actually an IDEA action because she alleges Defendants

violated Shanell's right to an equal access to public education as a person with a disability.

According to Defendants, even if a plaintiff does not bring a claim under the IDEA, exhaustion

of IDEA administrative remedies is a prerequisite for filing any federal claim for relief which is

also available under the IDEA. (*Id.*) Jenkins responds that her claim is not an IDEA action

because the claims presented do not arise out of the IDEA, and she and her daughter do not seek

any remedy available under the IDEA. (Doc. 20 at 13.) Jenkins further argues that even if the

---

[6] Jenkins' Complaint muddles various potential claims and theories of liability and is maddeningly imprecise as to what federal rights Defendants allegedly violated and what remedies she seeks. As a result, both the Court and the Defendants are forced to parse the Complaint and guess as to Jenkins' true aim. By failing to plainly plead her case and articulate facts relevant to support actual claims, Plaintiff makes the Court's task of ruling on Defendants' motion for summary judgment needlessly difficult. Specifically, the Court is compelled to resolve whether Plaintiff's claim is, indeed, within the ambit of the IDEA because, although she argues that her claims "do not implicate the IDEA" (doc. 20 at 12), Plaintiff asserts in her Complaint that she seeks to "vindicate rights guaranteed Plaintiff and her minor daughter under ... the laws of the United States guaranteeing equal access to public education by persons with disabilities" (doc. 1 ¶ 19). Jenkins would have been better served had she decided what rights she hoped to vindicate before she filed her complaint.

IDEA applied to the claims presented, she would not be required to exhaust administrative remedies because to do so would be futile. (*Id*. at 14.)

The IDEA (Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq*.) provides that plaintiffs must exhaust their administrative remedies before bringing suit in federal court to obtain relief that is also available under the IDEA. *Doe v. Smith*, 879 F.2d 1340, 1343-44 (6th Cir. 1989). However, exhaustion is not required if it would be futile or inadequate to protect the plaintiff's rights. *Covington v. Knox County Sch. Sys.*, 205 F.3d 912 (6th Cir. 2000).

In *Covington*, the plaintiff brought a § 1983 action against her son's school alleging violations of her son's Fourth, Fifth, and Fourteenth Amendment rights. As in this case, Covington's complaint did not allege violations of or even mention the IDEA, but the defendant argued it was entitled to judgment because Covington did not exhaust her administrative remedies under the IDEA. The Sixth Circuit Court of Appeals reversed the district court's grant of summary judgment for the defendant, finding that "exhaustion is futile when ... damages are the only suitable remedy ... and yet damages are unavailable though the administrative process." *Id*. at 912. After concluding that exhaustion would be futile, the court declined to express an opinion as to whether Covington's complaint actually fell within the ambit of the IDEA. *Id*. at 916; *see also Unroe v. Board of Educ. Rock Hill Local School Dist*., No.1:04-CV-181, 2006 WL 22081 (S.D. Ohio Jan. 4, 2006) (holding that because the children were no longer enrolled in the school, there was no remedy available under the IDEA).

Shanell is no longer enrolled as a student at Rock Hill, thus no administrative remedy could alleviate her alleged injuries. Therefore, the Court finds the reasoning of *Covington*

applicable and concludes that the relief Jenkins seeks is not available under the IDEA.

Defendants' argument that Jenkins' claim is actually an IDEA action is, therefore, unpersuasive.[7]

**B.      42 U.S.C. § 1983 and Municipal Liability**

Jenkins asserts two separate claims under 42 U.S.C. § 1983: retaliation for her exercise of

her First Amendment rights, and violation of her and her daughter's First Amendment right to

privacy.[8]  Defendants urge the Court to dismiss Jenkins' retaliation claim on grounds that

Jenkins and her daughter never engaged in any constitutionally protected activity, namely, that

the subject of Jenkins' "speech" was not of public concern and thus not within the protection of

the First Amendment.  Defendants urge the Court to dismiss Jenkins' privacy claim on grounds

---

[7]  In further support of their position that Jenkins cannot pursue her § 1983 claim because her claim is properly one under the IDEA, Defendants filed as additional authority the decision of *Long v. Dawson Springs Independent School District*, No. 05-5535, 2006 U.S. App. LEXIS 22196 (6th Cir. Aug. 25, 2006).  (Doc. 29.)  In *Long*, the plaintiff brought an IDEA claim and a separate § 1983 claim seeking money damages for the defendant's alleged violation of the IDEA. The Sixth Circuit Court of Appeals held that a plaintiff may not seek money damages for violations of the IDEA under § 1983.  *Id.* at * 16.  *Long* is not instructive on the issues presented in this case because Jenkins' § 1983 claim is not based on Defendants' violation of the IDEA but ostensibly for Defendants' alleged violation of First Amendment free speech and privacy rights.

[8]  The precise nature of Jenkins' § 1983 claim is difficult, if not impossible, to discern from the Complaint itself.  Jenkins captions her first claim, "42 U.S.C. § 1983: First Amendment Privacy Violation."  However, Paragraph 19 states that the claim is brought "pursuant to 42 U.S.C. § 1983 to vindicate rights guaranteed Plaintiff and her minor daughter under the First Amendment to the Constitution of the United States and the penumbra of familial rights recognized by the Supreme Court of the Unites [sic] States; through the Fourteenth Amendment to the Constitution of the United States; and the laws of the United States guaranteeing equal access to public education by persons with disabilities."  To confuse the issue further, the following paragraph states, "Defendant's actions, in retaliating under color of law against Plaintiff because of her public complaints, violated Plaintiff's and the minor's First Amendment rights to free expression and privacy."  It is only through Plaintiff's memorandum in opposition to Defendants' Motion for Summary Judgment that the nature of the claim becomes apparent. Jenkins alleges that Defendants retaliated against her for her exercise of her First Amendment right to free speech (*see* doc. 20 at 14-18) and that Defendants violated her and her daughter's "informational right to privacy" (*see id.* at 18-20).

that she has not identified any privacy right that was violated by the Defendants. Additionally, Defendants argue that the Board cannot be held liable in a § 1983 action under a theory of municipal liability because Jenkins cannot establish that the alleged deprivation of Jenkins' and her daughter's constitutional rights was caused by an official policy or custom of the school district. (Doc. 19 at 11.)

Section 1983 is not itself a source of substantive rights but provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Thus, to establish a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). As a general rule, public officials acting within the scope of their official duties are shielded from civil liability by the qualified immunity doctrine. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The doctrine protects officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Courts apply a two-step analysis in determining whether a public official facing liability for civil damages is immune from suit. *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996). First, the court must determine whether the defendant violated a clearly established constitutional right. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Russo*, 953 F.2d at 1042. Second, the court must determine whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what the officer allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Dickerson*, 101 F.3d at 1158.

11

Respondeat superior is not available as a theory of recovery under § 1983.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978).  Therefore, a court must examine a municipal liability claim against a school board by applying a two-pronged inquiry: "(1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the ... [s]chool [b]oard is responsible for that violation."  *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  For liability to attach, both questions must be answered in the affirmative.  *Id.* at 506.  The threshold question, then, is whether Jenkins has asserted the deprivation of a clearly established constitutional right.  The Court finds that she has not.

### 1.  Retaliation for Exercising the First Amendment Right to Free Speech

The three elements of a retaliation claim are: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.  *Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999) (citing *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)).  To be considered constitutionally protected, speech must touch upon a matter of public concern.  *Connick v. Myers*, 461 U.S. 138 (1983).  Whether speech addresses a matter of public concern is determined by the content, form, and context of a given statement.  *Id*. at 147-48.

Jenkins argues that the *Connick* standard requiring protected speech to address matters of public concern applies only to First Amendment retaliation claims brought by public employees.  (Doc. 20 at 15.)  The Court does not agree that the application of the *Connick* standard is so limited, and Jenkins directs the Court to no authority that so holds.  To the contrary, courts

12

considering First Amendment retaliation claims brought by parents of school-age children hold that for speech to be protected, it must involve matters of public concern.  *See, e.g.*, *Landstrom v. Illinois Dept. of Children and Family Servs.*, 892 F.2d 670 (7th Cir. 1990) (analogizing to the public employment context and holding that parents' speech involving purely personal complaints about the school's treatment of their daughter could not support a First Amendment claim); *Clark v. West Contra Costa Unified Sch. Dist.*, No. C-98-4884, 2000 WL 336382 (N.D. Cal. March 15, 2000) (same); *Rodgers v. Duncanville Indep. Sch. Dist.*, No. 3-04-CV-0365, 2005 WL 770712 (N.D. Tex. April 5, 2005) (same); *Mnyofu v. Bd. of Educ. of Rich Township High Sch. Dist. 227*, No. 03-C-8717, 2005 WL 2978735 (N.D. Ill. Nov. 1, 2005) (same).  Thus, to fall within the protection of the First Amendment, Jenkins' expression must touch upon a public concern, "a requirement satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern of the community, rather than merely a personal grievance." *Mnyofu*, 2005 WL 2978735 at *5.

The expression that Jenkins alleges warrants constitutional protection consists of her complaints to others (Jenkins dep. vol. III, 187) and the letter she wrote to the editor of *The Ironton Tribune* concerning her dissatisfaction with the way Rock Hill was treating Shanell.  The letter read as follows:

> To the editor:
> I have a 7-year-old daughter who is diabetic and has attended Rock Hill No. 2 school for three years.  I received a phone call from the superintendent Nov. 27 and was told I couldn't bring my daughter back to school.  I was told she wasn't enrolled there anymore.
> The school took it upon themselves to withdraw her without my permission and said that I was the one who withdrew her.  We tried going to the school and got escorted out by a teacher.  I made contacts with the state and got her back in school after she missed seven days.

13

> Now, we are being treated differently, just because I'm fighting for my daughter's rights.  There's only one teacher in the school willing to take responsibility for my daughter's health issues.  This goes to show you how much "teachers" care about your children.

(Jenkins aff. ¶ 48, Ex. A.) *The Tribune* published Jenkins' letter on Thursday, December 13, 2001.

Jenkins alleges that in retaliation for her writing this letter, Superintendent Evans called the Lawrence County Department of Job and Family Services on December 19 and made a false report that Jenkins had neglected Shanell's health and welfare.  (Doc. 1 ¶ 16; Jenkins aff. ¶ 54.) Evans denies making a complaint to Family Services.  (Evans dep. vol. III, 39.)  Nonetheless, even assuming that Evans did lodge the complaint that spurred Family Services to investigate Jenkins, the Court cannot conclude that Jenkins has stated a constitutional violation.  Even though Jenkins' comments were made to others and her letter was publically disseminated by means of the local newspaper, her comments concerned her daughter's specific situation and did not implicate the Defendants' conduct with respect to anyone else.  Jenkins testified that she wrote the letter because she "felt that the public should know what was going on with [her] daughter" and that she did not write the letter to address the situation of other students. (Jenkins dep. vol. III, 9-11.)  Because Jenkins' comments fail as a matter of law to relate to a matter of public concern, her First Amendment retaliation claim must fail.  Furthermore, the Complaint does not allege and there is no evidence to support a claim that Shanell engaged in or attempted to engage in any protected speech.  Accordingly, the Court GRANTS Defendants' motion for summary judgment on Jenkins' First Amendment retaliation claim.

14

### 2.      Right to Privacy

Jenkins asserts that the Defendants violated her and Shanell's privacy when Nurse

Wagner asked Shanell what she was eating at home and when someone at the school called and

made an anonymous report to Family Services.  (Jenkins dep. vol. II, 45; Jenkins dep. vol. III,

191.)  Jenkins also vaguely asserts that her privacy was violated because she and her daughter

"were on display.  I mean we were the talk of the town.  I mean everywhere we went people

knew who we were."  (Jenkins dep. vol. III, 193.)  In her memorandum in opposition to

Defendants' motion to dismiss, Jenkins broadens the scope of her claim, arguing that the "Claim

[of First Amendment Privacy Violation] implicates two distinct but intersecting privacy rights.

A parent's right to the orderly rearing and education of her children is afforded constitutional

protection [by the Fourteenth Amendment]....  Further, every person enjoys an 'informational

right to privacy.'..." (Doc. 20 at 18.)

Jenkins alleges that the conduct of the Defendants impaired her right to the orderly

rearing and education of Shanell because "from October, 2001 through May, 2002, the child

received almost no education, solely as a result of the obstacles thrown in their way by and at the

direction of Evans." (Doc. 20 at 19.)  Shanell missed seven days of school in late November-

early December 2001 and then missed three months of school from January 2002 until the end of

the school year.  Even taking as true Jenkins' assertions that Superintendent Evans did not permit

Shanell's attendance during the seven missed school days and then did not consistently provide

Shanell with an in-home tutor for the last three months of the school year,[9] Jenkins directs this

---

[9]  In fact, Superintendent Evans was not responsible for assigning a tutor and overseeing
home instruction.  Rather, such duties belonged to Fred Evans, Rock Hill Elementary School
Principal, who is not a party to this lawsuit.  (Lloyd Evans dep. vol. II, 70.)

Court to no authority that holds that such actions violate a clearly established constitutional right. In fact, Jenkins cites no authority whatsoever on the contours of "a parent's right to the orderly rearing and education of her children."

Furthermore, it is undisputed that Shanell's physician recommended home schooling for Shanell beginning in January 2002. The tutor assigned to Shanell indicated in a letter to Superintendent Evans that she was having difficulties setting up times to meet with Shanell and that when she did set up an appointment, Shanell would not be there. (Evans dep. vol. II, 75.) Perhaps Defendants should have done more to find a replacement tutor to assist Shanell in her home studies. However, Jenkins cites no authority to indicate that the school's inability to provide an in-home tutor constitutes a violation of a parent's constitutional right to the orderly rearing and education of her child.

Similarly, the record cannot sustain a finding that the Defendants violated Jenkins' or her daughter's informational right to privacy.[10] The Supreme Court has recognized the right of citizens to control the dissemination of sensitive information about one's self. *Whalen v. Roe*, 429 U.S. 589, 599-600(1977). The Sixth Circuit has narrowly construed *Whalen* to "extend the right to informational privacy only to interests that implicate a fundamental liberty interest." *Bloch v. Ribar*, 156 F.3d 673, 684 (6th Cir.1998). In assessing these claims, courts must apply a two-part test: "(1) the interest at stake must implicate either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the

---

[10] The Court is compelled to note that the United States Supreme Court expressed the opinion that the "right of privacy" is founded in the *Fourteenth* Amendment's concept of personal liberty. *Roe v. Wade*, 410 U.S. 113, 152 (1973); *see also Flaskamp,* 385 F.3d at 944-45. Jenkins does not explain why she asserts her right to privacy claim under the First Amendment.

16

information must be balanced against the individual's interest in keeping the information private." *Flaskamp v. Dearborn Pub. Sch.,* 385 F.3d 935, 945 (6th Cir. 2004).

Jenkins' claim cannot satisfy either prong of this analysis.  First, Jenkins cites absolutely no authority for the proposition that a parent has a fundamental liberty interest in information pertaining to her management of her child's diabetes.  Second, Jenkins has no evidence that Defendants ever revealed Shanell's medical records to anyone.  (Jenkins dep. vol. III, 194.)

In short, absent authority holding that actions like those allegedly taken by Superintendent Evans violate a clearly established constitutional right, the Court must conclude that Evans is shielded from liability by the qualified immunity doctrine.  Because Jenkins has not asserted the deprivation of any constitutional right, the Court need not inquire into whether Superintendent Evans' actions were objectively unreasonable or whether the School Board is responsible for the alleged violations.

## IV.    PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' REPLY MEMORANDUM

In their Reply Memorandum in Support of Their Motion for Summary Judgment (doc. 21), Defendants argue that Jenkins improperly relied on her affidavit, filed contemporaneously with her memorandum in opposition to Defendants' motion, to create a genuine issue of material fact.  Specifically, Defendants point out that Jenkins was deposed four times from December 2004 through April 2005 yet relied almost exclusively on her affidavit to support her opposing memorandum.  (*Id*. at 2.)  Primarily at issue is Jenkins' affidavit testimony that Superintendent Evans told her that he was the one who called Family Services to report Jenkins' alleged medical neglect of Shanell.  (*Id*. at 3.)  Defendants also object to the fact that Jenkins supported her opposition memorandum with the affidavits of parties in unrelated litigation.

17

Jenkins moved to strike Defendants' reply memorandum asserting that it contained "false statements of material fact."  Upon review of Jenkins' motion, the Court agrees with Jenkins that Defendants overstate certain discrepancies between Jenkins' deposition testimony and her affidavit.  For example, Defendants are incorrect that Jenkins' first mention of Superintendent Evans' alleged admission that he called Family Services was in her affidavit.  In fact, Jenkins recorded this alleged statement by Evans in her personal notes, copies of which were available to the Defendants *during* Jenkins' deposition testimony.  (Jenkins dep. vol. II, Ex. B.)  Despite Defendants' overstatements, the Court is not compelled to strike the reply as Plaintiff's motion has sufficiently clarified the facts.  Furthermore, the Court has construed all the evidence in favor of Jenkins, the non-moving party, as it must do in deciding a motion for summary judgment.  In so doing, the Court assumed for the purposes of the motion that Evans did contact Family Services as Jenkins alleges.  Regardless, even assuming that Evans contacted Family Services, the Court has concluded that Defendants are entitled to judgment as a matter of law. Accordingly, Plaintiff's Motion to Strike is DENIED.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (doc. 19) and **DENIES** Plaintiff's Motion to Strike Defendants' Reply Memorandum (doc. 22).

IT IS SO ORDERED.


         s/Susan J. Dlott
         Susan J. Dlott
         United States District Judge

18